UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Civil No. 11-2536 (PAM/FLN)

Vern S. Hammond,

        Plaintiff,

v.                                          **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

        Defendant

_____

Fay E. Fishman, Esq., for Plaintiff

David W. Fuller, Assistant United States Attorney, for Defendant

_____

Plaintiff Vern Hammond seeks judicial review of the final decision of the Commissioner of

Social Security ("Commissioner"), who found Plaintiff became disabled on February 1, 2009, but was

not disabled from his alleged onset date of April 25, 2001 through January 31, 2009. The matter was

referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant

to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over the claims pursuant to 42

U.S.C. § 405(g). The parties submitted cross-motions for summary judgment. [Doc. Nos. 16, 23.]

For the reasons which follow, this Court recommends that Plaintiff's motion for summary judgment

be denied and Defendant's motion for summary judgment be granted.

# I.   INTRODUCTION

Plaintiff first established disability and received disability insurance benefits as of December 1987, and his benefits ceased in 1995, after completion of a trial work period. (Tr. 683.)[1] Plaintiff protectively filed for disability insurance benefits and supplemental security income on April 30, 2001, alleging a disability onset date of April 25, 2001. (Tr. 120-23.) His applications were denied initially and upon reconsideration. (Tr. 82-85, 88-89.) He requested a hearing before an ALJ, and the hearing was held on September 3, 2002. (Tr. 30-64.) The ALJ denied Plaintiff's applications for benefits on October 21, 2002. (Tr. 15-26.) The Appeals Council then denied Plaintiff's request for review. (Tr. 11-13.) Plaintiff filed an action seeking judicial review with the United States District Court, District of Arizona, and on July 7, 2003, the court remanded to the Commissioner for further proceedings. (Tr. 510, 512-13.)

Plaintiff filed subsequent applications, which were consolidated and addressed in the second administrative hearing on January 13, 2004. (Tr. 489-509.) The ALJ denied Plaintiff's applications on February 10, 2004, and the Appeals Council denied review. (Tr. 476-88, 466-68.) Plaintiff again sought judicial review, and the United States District Court, District of Arizona remanded the case to the Commissioner for further proceedings. (Tr. 622-23.) A third hearing was held before an ALJ on February 27, 2006, again resulting in a denial of benefits. (Tr. 627-66, 600-16, 591-94.) Plaintiff sought judicial review a third time, and the United States District Court, District of Arizona affirmed the Commissioner's decision. (Tr. 709-74.) After being selected for the Ninth Circuit Court of

---

[1] Respondent filed a two-volume Replacement Administrative Record in this matter on January 27, 2012 [Doc. No. 11], cited here as "Tr." The Court cites to several medical records from the first volume of the Administrative Record filed by Respondent, which do not appear to be in the Replacement Record. [Doc. No. 7]. Those records are cited as "Supp. Tr."

Appeals' mediation program, the parties stipulated to remand the case to the Commissioner for further proceedings. (Tr. 704-07.)

Plaintiff moved to Minnesota, where the fourth administrative hearing was held on May 11, 2010. (Tr. 775-835.) On October 19, 2010, ALJ Diane Townsend-Anderson found Plaintiff disabled as of February 1, 2009, but not before that date. (Tr. 679-98.) The Appeals Council denied review. (Tr. 667–70.) Plaintiff filed a complaint for judicial review in this Court on September 2, 2011. The matter is now before this Court on cross-motions for summary judgment. Plaintiff is pursuing disability insurance benefits only, and his date last insured is December 31, 2006.

## II. STATEMENT OF FACTS

### A. Medical Evidence

The Court's review of the evidence focuses on evidence relevant to the time period of April 2001 through December 31, 2006. Plaintiff was found to be disabled as of February 1, 2009, around the time he was diagnosed and treated for coronary artery disease and Valley Fever, also complicating his treatment for psoriatic arthritis, because he was taken off Humira.[2] (Tr. 696.)

### 1. Dr. Michael Stone

On March 13, 2001, Dr. Michael Stone, a podiatrist, recommended that Plaintiff have reconstructive foot surgery. (Tr. 326.) Dr. Stone noted, "the patient has psoriatic arthritis[3] and is

---

[2] Humira is indicated for reducing the signs and symptoms of moderate to severe active rheumatoid arthritis in adults who have not responded to other medications. *Physician's Desk Reference* ("*PDR*") 474 (59th ed. 2005).

[3] Psoriatic arthritis is a chronic, progressive disease; and the main symptoms are joint pain, stiffness and swelling accompanied by psoriasis. http://www.mayoclinic.com/health/psoriatic-arthritis/DS00476. Symptoms can be mild to severe, and flares may alternate with remission. *Id.* Without treatment, it may be disabling. *Id.* It can cause deformities in the hands and feet, achilles tendinitis pain, plantar fasciitis,

markedly disabled. It is very difficult for him to walk and ambulate as previously documented." (*Id.*) The operation was performed on April 25, 2001, and consisted of arthrodesis of the first metatarsal on the right foot with fixation and screws; metarsal head resections of the second, third, fourth and fifth metatarsophalangeal joints on the right foot; hammertoe repair of the third and fourth toes on the right foot; bursa excisions on the right foot; and resection of the second and third metatarsal joints of the left foot. (Tr. 311-14.) Several months after surgery, Plaintiff was "essentially asymptomatic" except for occasional discomfort, probably due to scar tissue. (Tr. 296.)

The next year, on July 9, 2002, Dr. Stone completed a certification for Family Medical Leave Act for Plaintiff. (Tr. 407-08.) He stated that Plaintiff had foot deformities requiring reconstructive foot surgery. (Tr. 407.) He would not recommend work duty for Plaintiff requiring prolonged walking, standing or lifting. (Tr. 408.) He felt that vocational rehabilitation would be reasonable. (*Id.*) On the same day, Dr. Stone completed a Physical Residual Functional Capacity ("RFC") Questionnaire regarding Plaintiff. (Tr. 409-14.) Plaintiff's symptoms were pain with walking or standing, and the clinical findings were joint destruction in the feet with reconstructive surgery. (*Id.*) Plaintiff's pain would frequently interfere with attention and concentration; he could walk one block, stand for ten minutes, stand and walk less than two hours in eight-hour day, needed to change position at will, needed unscheduled breaks and to rest for 20-30 minutes, could occasionally lift less than ten pounds; he could stoop, bend and crouch less than 10% of the day; and he would miss work once a month. (Tr. 410-13.)

---

inflammation in the joints between the vertebrae, and the joints between the spine and pelvis (sacroiliitis).
http://www.mayoclinic.com/health/psoriatic-arthritis/DS00476/DSECTION=symptoms
Diagnostic tests include X-rays to show changes in the joints, and MRIs to show problems with ligaments, especially in the feet and low back.
http://www.mayoclinic.com/health/psoriatic-arthritis/DS00476/DSECTION=tests-and-diagnosis

## 2. Dr. James Carpenter

Plaintiff saw his rheumatologist, Dr. James Carpenter, for a preoperative examination for bilateral foot surgery in April 2001. (Tr. 322-23.) Plaintiff had considerable discomfort in both feet, significant pain in the second finger of the left hand, and pain in the right knee, right elbow, and low back. (Tr. 322.) On examination, Plaintiff had limited range of motion in the second left finger with mild to moderate synovitis.[4] (*Id.* at 323.) He had mild discomfort in the right elbow and shoulders at extreme ranges of motion. (*Id.*) His grip strength was normal in the right hand and mildly reduced in the left hand. (*Id.*) His back and neck range of motion were normal. (*Id.*) Plaintiff had large areas of plaque on his extremities and trunk. (*Id.*) He had deformities of the feet. (*Id.*) Dr. Carpenter noted Plaintiff applied for disability but recognized he was "likely able to do a sedentary or light work." (*Id.*)

Plaintiff returned to Dr. Carpenter on October 10, 2001. (Tr. 288-89.) Plaintiff had left buttock and thigh pain after sitting for a long time, and with bending and stooping. (Tr. 288.) He still had discomfort in his feet but with significant improvement since quitting his delivery service job. (*Id.*) His hand discomfort was mild and not particularly limiting. (*Id.*) On examination, Plaintiff had no flexion in one finger of his left hand, and normal to mildly reduced grip strength, with minimal synovitis. (*Id.*) Plaintiff was tender over the joints in his feet. (*Id.*) He had mild discomfort in the knees and back with normal range of motion. (*Id.*) Plaintiff had x-rays, showing left sacroiliitis,[5]

---

[4] Synovitis is inflammation of a synovial membrane, especially that of a joint. When used generally, the term means the same as arthritis. *Stedman's Medical Dictionary* ("*Stedman's*") 1773 (27th ed. 2000).

[5] Sacroiliitis is inflammation of the sacroiliac joint. *Stedman's* at 1587.

which might relate to arthritic disease or infection.  (Tr. 290.)  He also had mild to moderate degenerative changes at T10-11 and T11-12.  (*Id.*)

At that time, Plaintiff's medications included Celebrex, methotrexate,[6] prednisone, and hydrocodone.  (Tr. 288.)  Dr. Carpenter diagnosed psoriatic arthritis and oligoarthritis,[7] disability in the feet, degenerative thoracolumbar disk disease with no evidence of radiculopathy, and psoriasis that appeared controlled.  (Tr. 289.)  Dr. Carpenter opined Plaintiff could not work in a job requiring prolonged standing or uninterrupted sitting, but with a "proper degree of autonomy regarding movement" sedentary and light work "could likely be accomplished."  (*Id.*)

Nine months later, on July 10, 2002, Dr. Carpenter completed a Physical RFC Questionnaire for Plaintiff.  (Tr. 400-06.)  He stated [Plaintiff's] "report of current functional capacity is incorporated into my report."  (Tr. 400.)  Plaintiff had pain, swelling and decreased functional ability in his hands, feet, neck and back.  (*Id.*)  He also suffered depression.  (*Id.*)  Plaintiff felt incapable of even low stress due to difficulty concentrating.  (*Id.*)  He felt unable to stand for any prolonged period.  (*Id.*)  Currently, he could only use the third and fourth fingers of his left hand.  (*Id.*)  Emotional factors contributed to the severity of his pain.  (Tr. 402.)  Plaintiff could walk one block, sit for fifteen minutes at a time, stand for 15-20 minutes at a time, sit and stand for a total of less than two hours in a workday, had to walk every 15-20 minutes, had to sit or stand at will, could not work

---

[6] Methotrexate is used to treat severe psoriasis or severe active rheumatoid arthritis as a last resort because methotrexate can cause very serious side effects. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000547/

[7] Oligoarthritis is an inflammatory arthritis characterized by clinical swelling of only a few joints.  R.J. Wakefield, M.J. Green, H Marzo-Ortega, P.G. Conaghan, W.W. Gibbon, D. McGonagle, S. Proudman, and P. Emery, "*Should Oligoarthritis Be Reclassified?  Ultrasound Reveals a High Prevalence of Subclinical Disease,*" ANN RHEUM DIS 2004; 63:382-85, available at http://ard.bmj.com/content/63/4/382.full.

an eight-hour day, could never lift and carry less than ten pounds, could not use his left hand repetitively, could only use his right hand repetitively for ten percent of the time, could not stoop, bend or crouch, and would miss more than four days of work per month.  (Tr. 403-05.)

### 3.   Dr. Ralph Bennett

Plaintiff saw Dr. Ralph Bennett for a rheumatology consultation on February 12, 2002.  (Tr. 416-17.)  Dr. Bennett reviewed Plaintiff's history, noting he was diagnosed with psoriatic arthritis in 1987;  he took methotrexate the last two years; he had surgery on his left index and fifth finger, with some loss of motion in his wrists; and both first toes were fused.  (Tr. 416.)  Plaintiff complained of pain in his feet making it hard to walk around a grocery store.  (*Id.*)  His low back hurt when sitting, and he could no longer drive a delivery truck.  (*Id.*)  On examination, Plaintiff had multiple large patches of psoriasis on his legs and trunk, nail pitting, no edema in the extremities, decreased extension of the left wrist, and swelling in a joint of the left first finger.  (Tr. 417.)  His grip was diminished on the left.  (*Id.*)  Plaintiff had full cervical range of motion, and was intact neurologically and in muscular strength.  (*Id.*)  Because methotrexate could have side effects related to the liver, Dr. Bennett told Plaintiff to reduce his alcohol intake to no more than four drinks in a week, the less the better.  (Tr. 417.)

X-rays of Plaintiff's hands, feet, and sacroiliac joints showed the following:  erosive changes consistent with a history of psoriatic arthritis on the left hand; right hand negative; right sacroiliac normal; sclerosis of left sacroiliac may be related to psoriatic arthritis; right foot erosive changes with spontaneous bony fusion of several forefoot bones; and left foot fusions of several forefoot joints.  (Tr. 423-24.)

### 4.   Dr. Gustavo Armendariz

Plaintiff saw Dr. Gustavo Arnendariz on September 4, 2002, and complained of feet and knee pain. (Tr. 438-39.) Cortisone was not helping. (Tr. 438.) On examination, there was no peripheral edema, some soft tissue swelling of the right foot, deformed toes, tenderness of the plantar, some tenderness in the knees, but no joint instability or effusion.[8] (Tr. 439.) Dr. Armendariz opined that Plaintiff had exhausted surgical management of the foot. (*Id.*) He stated that Plaintiff "will always be limited in ability to weight bear on his forefoot." (*Id.*) He felt Plaintiff's knee pain would respond to physical therapy. (*Id.*) Dr. Armendariz wrote, "[h]e will be limited in his ability to stand and walk and he certainly cannot climb ladders and walk on uneven surfaces and most of his work should be in the sedentary status." (*Id.*)

## 5. Dr. Carolyn Pace

Plaintiff was referred to Dr. Carolyn Pace for evaluation on May 1, 2002, after Dr. Bennett changed Plaintiff's medication from methotrexate to Arava,[9] due to Plaintiff's elevated liver function tests. (Tr. 425-27.) Plaintiff complained of the following symptoms: pain and limited motion in the neck; significant pain in the left hand, feet, ankles, and right shoulder; severity of pain 9+ out of 10; some fatigue; difficulty swallowing, wheezing, heartburn, memory loss, night sweats, worry, difficulty falling asleep, and excessive thirst. (Tr. 425.) Abnormalities discovered on examination were limited cervical range of motion, ankle swelling and tenderness, left fingers and thumb joint tenderness, multiple psoriatic lesions on lower extremities, diffuse tenderness over the spine, and tender points consistent with fibromyalgia. (Tr. 426.) Dr. Pace diagnosed psoriatic arthritis, probable

---

[8] Effusion is the escape of fluid from the blood vessels or lymphatics into the tissues or a cavity. *Stedman's* at 570.

[9] Arava is indicated to treat active rheumatoid arthritis by reducing signs and symptoms, inhibiting structural damage to joints, and improving physical function. *PDR* 695.

spondyloarthropathy,[10] and fibromyalgia with secondary depression. (*Id.*) She discontinued Arava and prescribed methotrexate, Duragesic patch[11], compazine and Remicade.[12] (*Id.*) X-rays taken the next day showed bilateral bony foraminal narrowing at C3-4, mild to moderate on the right and more severe on the left. (Tr. 436.) Plaintiff's pelvis, hips and lumbar spine x-rays were normal. (*Id.*)

Two weeks later, Plaintiff's pain decreased to a severity of 2 or 3 out of 10. (Tr. 428.) He appeared much more animated and optimistic. (*Id.*) His cervical pain was somewhat better using prednisone. (*Id.*) On June 25, 2003, Dr. Pace completed a Medical Source Statement for Plaintiff (Tr. 953-54.) She opined Plaintiff could sit for fifteen minutes without a break; he needed a break every fifteen minutes to prevent severe joint pain and swelling; he was limited to reaching, handling and fingering for five minutes at a time, and a total of twenty minutes a day; he was precluded from all postural limitations such as climbing, bending, crouching and crawling; he could not lift and carry due to joint pain and limited mobility; and he could walk up to ten minutes before needing a break. (*Id.*)

On July 1, 2002, Plaintiff asked Dr. Pace for a different antidepressant, because he thought Celexa was causing cold sweats. (Tr. 429.) Plaintiff's pain was at a severity level of 2-3 out of 10, but he wanted an increase in Duragesic. (*Id.*) Plaintiff had been unable to get Remicade, so Dr. Pace

---

[10] Spondylo means vertebrae, and arthropathy means any disease affecting a joint. *Stedman's* at 150, 1678.

[11] Duragesic, a trade name for fentanyl transdermal patches, is an opiate analgesic used to treat moderate to severe pain that is expected to last and cannot be treated with other pain medications. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000151/

[12] Remicade is used to treat autoimmune disorders such as rheumatiod arthritis and psoriatic arthritis. It works by blocking the action of a substance in the body that causes inflammation. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000267/

prescribed sulfasalazine.[13]  (*Id.*)  Plaintiff asked Dr. Pace to complete disability paperwork, and on

July 10, 2002, she completed an Arthritis Residual Functional Capacity Questionnaire.  (Tr. 429, 380-

86.)  Dr. Pace listed Plaintiff's symptoms as:  joint pain, fatigue, lack of mobility, very severe pain

requiring Fentanyl around the clock, unable to bend first and second fingers, limited mobility of the

shoulders and feet, reduced grip strength, tenderness in his hands, depression and anxiety.  (Tr. 380-

81.)  Plaintiff was incapable of even low stress.  (Tr. 381.)  He had side effects of chest pain and

sweating.  (Tr. 382.)

Dr. Pace indicated that Plaintiff was restricted to the following:  walk less than one block; sit

for twenty minutes; stand for fifteen minutes; could not work an eight-hour day with normal breaks;

needs to shift positions at will; needs a break every 15-20 minutes in order to rest for thirty minutes;

needs to elevate his legs 50% of the day; never lift and carry less than five pounds; could not use his

left hand for repetitive activities; could use his right hand only 50% of the day; would miss more than

four days of work per month; and should avoid humidity and cold.  (Tr. 382-85.)

Plaintiff saw Dr. Pace again on July 31, 2002, and complained of severe knee pain, at a level

of 4-5 out of 10.  (Tr. 545.)  His joint examination was unchanged.  (*Id.*)  Plaintiff's knees were

tender, and he was treated with injections.  (*Id.*)  On September 10, 2002, Plaintiff wanted to decrease

his Duragesic because it made him groggy.  (Tr. 544.)  He rated his pain 4 out of 10.  (*Id.*)  On

examination, he had tenderness in the joints, particularly in the feet and knees.  (*Id.*)  Plaintiff was

worried his disability hearing would increase his depression, so his antidepressant was increased.

(*Id.*)  About six weeks later, after Plaintiff started Remicade, he was doing very well.  (Tr. 542.)  His

---

[13] Sulfasalazine is an anti-inflammatory drug used to treat rheumatoid arthritis in people whose
disease has not responded well to other medications.
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000610/

psoriasis disappeared, and he was not depressed. (*Id.*) He had some tenderness over the joints in his hands but was overall much better. (*Id.*)

On November 27, 2002, Dr. Pace noted Plaintiff was recently diagnosed with diabetes. (Tr. 541.) His pain was improved with Remicade, but he had chronic deformities of the feet. (*Id.*) The next month, Plaintiff continued to be significantly better on Remicade, but he was still achy and taking painkillers. (Tr. 540.) On January 29, 2003, Plaintiff had more pain in the neck and back, rating the severity 4 out of 10. (Tr. 539.) On examination, he was tender over the MTP joints and the cervical spine. (*Id.*) Dr. Pace wrote that despite his significant improvement on Remicade, Plaintiff remained disabled from his job. (*Id.*) In March 2003, Plaintiff returned from a visit to Texas, where the weather aggravated his pain, and he rated his pain 6 out of 10. (Tr. 538.) On examination he had minimal tenderness over the MTP joints, but Dr. Pace wrote, "he is still disabled." (*Id.*) The next month, Plaintiff rated his pain 4 out of 10, the worst pain being in the knees, with pain waking him at night. (Tr. 537.) The Duragesic was helping, and his hands and feet were better, with minimal tenderness in the joints. (*Id.*)

After Plaintiff traveled to North Dakota, he had more pain in his back and neck, rating the severity 4 or 5 out of 10. (Tr. 536.) Plaintiff was taking oxycodone and Duragesic for pain. (*Id.*) The next month, Plaintiff asked Dr. Pace to complete disability paperwork, and she stated, "I do feel he continues to remain disabled." (Tr. 535.) Plaintiff had pain in his left hip, hands, and knees, and rated the severity 7 out of 10. (*Id.*) On examination, he was tender over the MTP joints and had minimal tenderness over the PIP joints. (*Id.*) Plaintiff's wife attended his next appointment with him on August 4, 2003. (Tr. 534.) She told Dr. Pace Plaintiff had trouble with his short-term memory. (*Id.*) Plaintiff again rated his pain 7 out of 10. (*Id.*) He felt Remicade was not working, so it would

be tapered, and he would start Enbrel.[14]  (*Id.*)  Plaintiff's pain and fatigue improved on Enbrel, and he rated his pain 4 out of 10.  (Tr. 532.)  On September 3, 2003, he had no synovitis in his joints, and no active psoriatic lesions.  (*Id.*)  He was taking Percocet and Duragesic for pain.  (*Id.*)

Plaintiff had more pain with weather changes in November.  (Tr. 531.)  He spent a lot of time staring at a computer screen, giving him headaches.  (*Id.*)  On examination, his MTP joints were mildly tender, and his psoriatic patches had spread.  (*Id.*)  On January 23, 2004, Dr. Pace wrote, "the patient continues to be disabled from his psoriatic arthritis."  (Tr. 1367.)  Plaintiff rated his pain 7 or 8 out of 10, and he was given a toradol injection.  (*Id.*)  Dr. Pace completed disability paperwork for Plaintiff and said, "I do firmly believe that this patient is completely disabled."  (*Id.*)  In March 2004, Dr. Pace noted Plaintiff was still "battling" for disability.  (Tr. 1366.)  Plaintiff complained of left shoulder pain, rating the severity 7 ½ out of 10.  (*Id.*)  He took Percocet for pain, and Dr. Pace prescribed lidoderm patches for his knees.  (*Id.*)  In May, Plaintiff said the lidoderm did not help his knees, but toradol helped.  (Tr. 1365.)  Plaintiff had pain in his cervical spine and feet, rating the severity 6 or 7 out of 10.  (*Id.*)  On examination, he was tender over the MTP joints and the hands. (*Id.*)  Dr. Pace wrote, "[t]he patient should be in my medical opinion on full complete medical disability due to his severe ongoing psoriatic arthritis."  (*Id.*)  In follow up about a month later, Dr. Pace switched Plaintiff from Enbrel to Humira, because his psoriasis was returning.  (Tr. 1364.)

Plaintiff saw Dr. Pace again on November 12, 2004, and reported Humira was helping but not as much as Remicade.  (Tr. 1363.)  He rated his pain 6 or 7 out of 10.  (*Id.*)  His depression was stable.  (*Id.*)  Objectively, he had some psoriatic patches over the left leg, knees and low back.  (*Id.*)  Dr. Pace increased his Humira and ordered x-rays of his lumbar spine and hips.  (*Id.*)  Plaintiff said

---

[14] Enbrel is indicated to treat active rheumatoid arthritis by reducing signs and symptoms and inhibiting structural damage of active arthritis in patients with psoriatic arthritis.  *PDR* at 580.

he was tolerating Duragesic and Percocet.  (*Id.*)  Four months later, Plaintiff rated his back pain 7 out of 10, and the pain came and went.  (Tr. 1362.)  His psoriasis was improving.  (*Id.*)  Plaintiff's depression was controlled with Lexapro and Wellbutrin.  (*Id.*)  On examination, there was no synovitis, swelling or effusion in his joints.  (*Id.*)

On May 23, 2005, Plaintiff's wife attended his appointment with Dr. Pace, and said he had been doing poorly for some time.  (Tr. 1238.)  She asked if he could have an increase in Duragesic because he woke up and paced the floor at night due to back and foot pain.  (*Id.*)  Plaintiff was already on "big doses" of Duragesic and Percocet, so Dr. Pace declined to increase his medication. (*Id.*)  There was no synovitis, swelling or effusion in Plaintiff's joints, and MRIs of his knees had been negative.  (*Id.*)  Dr. Pace ordered an MRI of his lumbar spine.  (*Id.*)  The x-rays indicated sacroiliitis.  (Tr. 1237.)  Plaintiff was stable overall, albeit with chronic pain.  (*Id.*)  Dr. Pace prescribed Ambien to help Plaintiff sleep.  (*Id.*)  His depression was doing well.  (*Id.*)

Plaintiff saw Dr. Pace again on June 10, 2005.  (Tr. 1237.)  He was "overall doing well" and his chronic pain was "stable."  (*Id.*)  Dr. Pace completed a Physical RFC Questionnaire for Plaintiff that day.  (Tr. 1046-51.)  She opined that he was incapable of even low stress because stress aggravates arthritis.  (Tr. 1048.)  He could walk less than one block, sit for twenty minutes, stand for fifteen minutes, could not work an eight-hour day with normal breaks, would need half-hour breaks every 15-20 minutes, could never lift and carry, could only use his right hand 5% of the time, could not use his left hand, needed to avoid cold, humidity, dust, and fumes, and would miss work more than four days per month.  (Tr. 1048-51.)

Plaintiff saw Dr. Pace again on November 30, 2005, and rated his back pain 6 out of 10, and complained of severe knee pain waking him at night.  (Tr. 1236.)  On examination, Plaintiff had no

synovitis in his joints. (*Id.*) There was no significant change on MRI of the right knee, with a peripheral tear of the medial meniscus, and a small increase in the size of a ganglion cyst. (Tr. 1419.) The left knee had a tiny ganglion cyst. (*Id*.) Several months later, Humira was working fairly well for Plaintiff, but he still had tenderness in the feet and knee pain. (Tr. 1235.) The cause of his knee pain was unclear, and there was no synovitis in his joints. (*Id.*) Plaintiff continued to take Wellbutrin and Lexapro, and had not been to a counselor lately. (*Id.*)

In August 2006, Plaintiff had recently been denied disability, and Dr. Pace stated, "the patient remains chronically and permanently disabled." (Tr. 1268.) Plaintiff had pain in his back and right foot. (*Id*.) There was no synovitis on examination. (*Id.*) Plaintiff next saw Dr. Pace on December 18, 2006, after having another surgery on his right foot. (Tr. 1267.) He was doing well on Humira, with no synovitis, swelling or effusion in the joints. (*Id.*) In March 2007, Plaintiff was feeling better mentally, but continued to have intermittent severe knee pain waking him at night. (Tr. 1266.) In 2008, Plaintiff's knee pain and depression resolved, but he continued to have chronic back and feet pain. (Tr. 1350-52.)

### 6.      Dr. Kimberly Leach

Plaintiff was evaluated by a podiatrist, Dr. Kimberly Leach on December 3, 2004. (Tr. 837-38.) He complained of pain and swelling in the right foot. (Tr. 837.) On examination, his patellar and achilles deep tendon reflexes were intact and equal bilaterally; he had normal reflexes and vibratory response; he ambulated with a pronated gait; his joint motions were adequate in the second through fifth metatarsalphalangeal joints bilaterally; his muscle strength was adequate; he had mild edema in a joint of the right foot, and pain with passive range of motion of the right foot joints. (Tr. 837-38.) X-rays showed surgical repair and probable bony regrowth at the fifth metatarsal. (Tr.

838.) Plaintiff's conservative treatment options were oral anti-inflammatory medication, massage with topical theragesic, cortisone injections, wide toe boxed shoes, ice, physical therapy, "relative rest," and custom orthotics. (*Id.*) Plaintiff was given an injection in a joint of the right foot. (*Id.*) On January 14, 2005, Plaintiff was in pain from having been on his feet a lot, and a recent cortisone injection had helped. (Tr. 836.) Plaintiff had some tenderness in the joints in his right foot, and mild edema. (*Id.*)

### 7. Dr. Robert Evans

Plaintiff was evaluated by Dr. Robert Evans, a podiatrist, on September 7, 2006. (Supp. Tr. 549.) On examination, Plaintiff walked with a propulsive gait cycle; his joint motion was decreased in the talocrural, midtarsal, and metatarsalphalangeal joints; and his muscle power was adequate. (*Id.*) Dr. Evans performed metatarsal osteotomies of Plaintiff's second through fifth toes of the right foot later that month. (Supp. Tr. 548.)

### 8. Social Worker Cherie Pray

Plaintiff's therapist, Cherie Pray, completed a Mental Impairment Questionnaire for Plaintiff on December 27, 2003. (Tr. 579-588.) Her first session with Plaintiff was on August 7, 2003; and Pray diagnosed major depressive disorder, with a current GAF score of 55.[15] (Tr. 579.) She stated that debilitating pain and the inability to work caused Plaintiff's depression. (*Id.*) She rated Plaintiff in a number of activities, noting he would have poor or no ability to do the following: maintain attention for a two-hour segment; maintain regular attendance and be punctual; sustain an ordinary routine without being unduly distracted; complete a normal workday and workweek without

---

[15] A GAF score of 55 represents the clinician's judgment that the individual suffers moderate symptoms or moderate difficulty in social, occupational or school functioning. *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-tr*") 32, 34 (American Psychiatric Association 4th ed. text revision 2000).

psychological interruptions; perform at a consistent pace; respond appropriately to changes in work stress; deal with normal work stress; and deal with stress of semi-skilled work. (*Id.*) Later that week, Pray wrote a letter stating Plaintiff had eight sessions of psychotherapy with her. (Tr. 589.) She diagnosed major depression, noting arthritis and pain contributed to Plaintiff's emotional distress. (*Id.*) Additionally, his medications caused headaches, fatigue, and sleeplessness. (*Id.*)

### 9. Social Worker Jean Young

Jean Young, a social worker who treated Plaintiff from August 5, 2005 through September 30, 2005, completed a Mental Impairment Questionnaire for Plaintiff. (Tr. 1052-59.) She assessed Plaintiff with a GAF score of 45,[16] and opined he would miss work more than three days per month. (Tr. 1052, 1055.) Young responded with "not a psychologist" to many questions on the form. (Tr. 1055-59.)

### 10. Consultative Examinations Ordered by the SSA

The SSA referred Plaintiff to Dr. James Huddleston for a consultative psychological evaluation on February 18, 2004. (Tr. 1003-07.) Plaintiff reported the following problems: his joints are "shot"; he has pain in his feet, knees, back and left hand; and he has frequent pain in most of his body. (Tr. 1003.) He left his delivery job in 2001 due to pain, and the pain has not diminished. (*Id.*) He sleeps erratically due to pain, and sometimes sleeps during the day. (Tr. 1003-04.) He watches television or does something on his computer during the day. (Tr. 1004.) He does some light housekeeping and leaves his house once a week. (*Id.*)

---

[16] A GAF score of 45 represents the clinician's judgment that the individual suffers serious symptoms or any serious impairment in social, occupational or school functioning. *DSM-IV-tr* at 32, 34.

Plaintiff received disability benefits from 1987 through 1995, and he went through a vocational rehabilitation program. (*Id.*) In 1995 through 1997, he worked as a laborer. (*Id.*) He then worked three years as an electrician. (*Id.*) From 2000 through April 2001, he worked as a driver. (*Id.*) He has had six surgeries on his feet, and two on his hands. (*Id.*) He had been taking Lexapro for two years, and was in therapy for the past six months. (*Id.*) Plaintiff said he was tired and constantly dealing with pain, which discouraged and depressed him. (*Id.*) His energy was diminished after fifteen minutes of activity. (*Id.*) He was moderately active socially. (*Id.*) Plaintiff believed his memory and concentration were poor. (*Id.*)

Plaintiff's mental status examination was normal; his mood was euthymic; and his memory and concentration were good. (Tr. 1005.) Dr. Huddleston diagnosed major depressive disorder, moderate. (Tr. 1006.) He did not believe this significantly impacted Plaintiff's functioning, but stated Plaintiff may be moderately limited in responding to normal work pressure due to pain and depression. (*Id.*) He opined Plaintiff was not significantly impaired in understanding, memory, concentration, persistence or social interaction. (*Id.*) Plaintiff would have a fair ability to deal with work stress. (Tr. 1008.)

The SSA referred Plaintiff to Dr. George O'Brien for a physical consultative examination on February 19, 2004. (Tr. 1010-1013.) Plaintiff reported constant pain in his low back, ankles and feet. (Tr. 1010.) On examination, Plaintiff was slightly overweight and semi-cooperative. (Tr. 1011.) He had decreased range of motion on the left side of the neck, some tenderness in the upper thoracic and base of the neck, straight leg raise test was positive, no edema in the extremities, somewhat reduced left shoulder range of motion, hand grip normal bilaterally, memory intact, left shoulder range of motion normal, no muscle atrophy in the quadriceps or calf muscles, sensation and reflexes were

normal, and gait was within normal limits. (Tr. 1011-12.) Dr. O'Brien noted Plaintiff would not give effort on strength tasks. (Tr. 1012.) He diagnosed degenerative joint disease, moderate to severe, and diabetes. (*Id.*) On a Physical Residual Functional Capacity Assessment form, Dr. O'Brien opined Plaintiff could lift and carry twenty pounds occasionally, ten pounds frequently; sit for six hours in an eight-hour day; required a sit and stand option every fifteen minutes; postural movements would be limited to occasional; and he had an unlimited ability to reach, handle, and finger objects. (Tr. 1038-45.)

On November 29, 2005, the SSA referred Plaintiff to Dr. Robert Narvaiz for a consultative psychological examination. (Tr. 1060-62.) Plaintiff reported that he felt suicidal earlier that day, but his mood appeared to be good. (Tr. 1061.) His other symptoms were amotivation, social isolation, anhedonia, intermittent trouble sleeping, and irritability. (*Id.*) Plaintiff said he could do some light shopping and cleaning, but his mobility was limited by back and feet pain. (*Id.*) Plaintiff's mental status examination, including memory and concentration, was normal. (*Id.*) Dr. Narvaiz diagnosed major depression and mood disorder secondary to back pain. (Tr. 1062.) He opined Plaintiff may have some difficulty interacting with others due to pain and irritability. (Tr. 1063-65.)

### 11. Non-examining state agency medical consultants

On July 25, 2001, a state agency medical consultant reviewed Plaintiff's social security disability file and opined that Plaintiff could occasionally lift twenty pounds, ten pounds frequently; could stand and/or walk two hours out of an eight-hour day; sit for six hours out of an eight-hour day; was limited in pushing and pulling with upper and lower extremities; all postural activities were limited to occasional; and Plaintiff would need to avoid concentrated fumes, odors, dusts and gases. (Tr. 372-79.)

Another state agency medical consultant reviewed Plaintiff's file on October 22, 2003. (Tr. 930-37.) He limited Plaintiff to lifting ten pounds occasionally and less then ten pounds frequently; standing and/or walking two hours out of an eight-hour day; sitting for six hours out of an eight-hour day; unlimited pushing and pulling with upper and lower extremities; all postural activities were limited to occasional with the exception of never climbing ladders, ropes or scaffolds; and avoid concentrated exposure to cold and hazards. (*Id.*) A third state agency medical consultant reviewed Plaintiff's file on March 2, 2005, and his physical residual functional capacity assessment of Plaintiff matched that of the first consultant's July 25, 2001 opinion, with the exception that he did not limit Plaintiff's ability to push and pull with his hands and feet. (Tr. 1038-45.)

A state agency psychological consultant reviewed Plaintiff's social security file on March 1, 2004, and completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique form regarding Plaintiff. (Tr. 1020-37.) Her opinion was that Plaintiff could understand instructions, perform satisfactory overall, might have trouble concentrating due to pain, but could maintain attendance and satisfactory productivity. (Tr. 1022.)

**B.      Administrative Hearing**

Plaintiff testified to the following at the hearing on May 11, 2010. He is married and has a degree in zoology and two years vocational training as an electrician. (Tr. 782-83.) Since 2001, Plaintiff switched between Enbrel, Remicade, Humira, and Arava to treat psoriatic arthritis. (Tr. 783-84.) He took Remicade from 2001 until 2003, then it quit working. (Tr. 788.) He tried Enbrel for a year-and-a-half, but it did not work well. (Tr. 788-89.) Next, he tried Humira. (Tr. 784, 789.) However, he had to discontinue Humira after having heart surgery. (Tr. 784.) He then had more

pain and stiffness in the joints, swelling in his feet, and increased patches of psoriasis. (*Id.*) After heart surgery, Plaintiff was diagnosed with Valley Fever. (Tr. 785-86.)

Between 2001 and 2008, when Plaintiff woke up in pain, he took pain pills and waited until he felt like doing something around the house. (Tr.*787.*) He washed dishes and watched a lot of television. (Tr. 787-88.) He had difficulty reading because he did not retain anything. (Tr. 788.) He used a computer for short periods of time. (Tr. 789.) He could dress and groom himself. (*Id.*) He was limited by back pain and pain in his feet. (Tr. 790-91.) He was constantly up and down seeking relief. (Tr. 791.) He could bend only two fingers of his left hand, but he did not have a lot of hand pain. (Tr. 791-93.) He also had surgery on his toes, which do not bend anymore. (*Id.*) He walked on the outsides of his feet, which caused pain to travel to his knee and hip. (Tr. 793-94.) Plaintiff has asthma, treated with an inhaler, and diabetes, treated with oral medication. (Tr. 797.)

When in pain, Plaintiff is depressed, has no motivation, cries easily, and sleeps a lot. (Tr. 795, 813.) His mood is better when he is in less pain. (Tr. 796.) Plaintiff continued to have phone conferences with his counselor in Arizona, when he could afford it. (*Id.*)

When Plaintiff quit working in 2001, he had surgeries on both feet. (Tr. 797.) Even after surgery, he could only be on his feet for fifteen minutes. (Tr. 799.) He needed to get off his feet for three or four hours before they stop hurting. (*Id.*) He could not walk a block on an uneven surface. (*Id.*) On a good day, he could walk back and forth one block; and he had two or three good days a week. (Tr. 802.)

Sitting in a chair for long caused Plaintiff's back to hurt. (Tr. 807.) His neck also started to ache, and he had headaches three or four times a week. (*Id.*) Using his computer for 15-20 minutes gave him headaches, but he does not use his computer much anymore. (Tr. 808.) Plaintiff used

Oxycontin, Fentanyl patches and methocarbamol for pain. (*Id.* at 808-09.) His medications caused a fuzzy feeling in his head, and lightheadedness when he stood up. (*Id.* at 809.) The side effects made it difficult for him to concentrate or remember. (*Id.*) He took narcotic pain medication every four hours. (Tr. 810.)

Plaintiff's wife, Dawn Hammond, also testified at the hearing. (Tr. 823.) Since 2001, Plaintiff was less mobile, often moving between his recliner and bed, without even showering. (*Id.*) About four out of seven days a week, between the years 2001 and 2006, he was unable to function. (Tr. 824.) He did very light housework, a little at a time. (Tr. 824-25.) He had trouble staying focused and remembering things. (Tr. 825.) He did not remember what he read. (Tr. 826.) Pain increased his depression and lack of concentration. (Tr. 826-27.) When depressed, he did not shower, dress or communicate. (Tr. 827.)

Dr. Andrew Steiner testified at the hearing as a medical expert, first going through the evidence, listing Plaintiff's various impairments. (Tr. 683, 814-17.) Dr. Steiner did not believe any of Plaintiff's physical impairments met or equaled a listed impairment. (Tr. 817.) He opined that Plaintiff's impairments would cause the following work limitations: sedentary work without foot pedals; no work in contaminated air; no work around hazardous machinery or unprotected heights; ability to change positions after one hour; occasional overhead work; no left hand power gripping; frequent but not continuous light pinching with the left hand; such as using a pen or pencil. (Tr. 817-18.)

The ALJ asked Dr. Steiner to comment on the RFC opinions of Dr. Pace and Dr. Carpenter. (Tr. 818.) Dr. Steiner said Dr. Pace seemed to rely more on Plaintiff's pain and fatigue reports, but his own opinion was that Plaintiff's pain was not as limiting as Dr. Pace suggested. (*Id.*)

Furthermore, he did not believe the objective evidence in the record supported Dr. Carpenter's 2002 opinion of Plaintiff's sitting, standing or hand limitations. (Tr. 819.) Dr. Steiner admitted he never examined Plaintiff, and agreed pain medication can interfere with the ability to focus and concentrate, and that people experience pain differently. (Tr. 819-22.)

Norman Mastbaum testified as a vocational expert. (Tr. 827-34.) The ALJ posed a hypothetical vocational question to Mastbaum, including Plaintiff's age, education, work experience, the impairments outlined by Dr. Steiner, and the following limitations: lifting and carrying ten pounds occasionally, and five pounds frequently; perform all functional aspects of sedentary work; but no work involving heights, ladders, scaffolding, foot pedal manipulations, dangerous or hazardous equipment or machinery; walking on uneven ground; temperature or humidity extremes; concentrated exposure to smoke, fumes or airborne irritants; occasional overhead work; change of position at least hourly; on the left, no power gripping, twisting or pounding; frequent but not continuous fine fingering and light pinching on the left; unskilled to low level semi-skilled work; work with low to moderate standards for persistence and pace; work with brief and superficial contact with others. (Tr.827-29.) Mastbaum testified such a person could not perform Plaintiff's past relevant work, but could perform other work such as production line monitor,[17] information clerk,[18] and telephone answerer.[19]

---

[17] U.S. Dep't of Labor, *Dictionary of Occupational Titles* (4th ed. rev. 1991) ("DOT") Code 739.687-182, with about 4,000 such jobs in the State of Minnesota. (Tr. 830.)

[18] DOT Code 237.367-046, with about 1,800 such jobs in the State of Minnesota. (Tr. 831.)

[19] DOT Code 235.662-026, with 1,100 such jobs in the State of Minnesota. (Tr. 831.)

The ALJ and Plaintiff's counsel posed several hypothetical questions incorporating the work restrictions proposed by Dr. Pace, and Mastbaum testified such a person could not perform Plaintiff's past relevant work or any other work in the regional or national economy. (Tr. 831-35.)

## C.    ALJ's Decision

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2006.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset date. (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)

3.    Since the alleged onset date of disability, April 25, 2001, the claimant has had the following severe impairments: psoriasis/psoriatic arthritis; status post a history of foot surgeries bilaterally for deformities associated with hammertoes and psoriasis; degenerative disc disease with low back and neck pain; coronary artery disease; asthma; status post a history of hand injury and surgical procedures; degenerative changes in the knee and left shoulder; diabetes; fibromyalgia; chronic pain syndrome; and depression. (20 CFR 404.1520(c) and 416.920(c).
. . .

4.    Since the alleged onset date of disability, April 25, 2001, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
. . .

5.    After careful consideration of the entire record, the undersigned finds that prior to February 1, 2009, the date the claimant became disabled, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the further limitations to lifting and carrying 10 pounds occasionally and 5 pounds frequently; no work involving heights, ladders or scaffolding, foot pedal manipulations, dangerous or hazardous machinery, walking on uneven ground; temperature or humidity extremes;

concentrated exposure to smoke, fumes or airborne irritants, work which would allow for only occasional overhead work and a change of position at least hourly at the work station; no power gripping, twisting, or pounding on the left; fine fingering and light pinching on the left on a frequent but not continuous basis; work which is unskilled to semi-skilled in nature with low to moderate standards for pace and persistence; and work where there is only brief and superficial contact with others.

. . .

6.    After careful consideration of the entire record, . . . as a result of increased pain and medication changes since February 1, 2009, the claimant has been unable to sustain the pace and persistence necessary for the performance of full-time competitive work activity.

. . .

7.    Since April 25, 2001, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . .

8.    Prior to the established disability onset date, the claimant was a younger individual age 18-44. The claimant's age category has not changed since the established disability onset date (20 CFR 404.1563 and 416.963).

9.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10.    Prior to February 1, 2009, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. Beginning on February 1, 2009, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.    Prior to February 1, 2009, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12.      Beginning on February 1, 2009, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966). . . .

13.      The claimant was not disabled prior to February 1, 2009, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

14.      The claimant was not under a disability within the meaning of the Social Security Act at any time through December 31, 2006, the date last insured (20 CFR 404.315(a) and 404.320(b)).

(Tr. 686-99.)

## III.   CONCLUSIONS OF LAW

### A.     Standard of Review

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). Judicial review of the final decision of the Commissioner is restricted to a determination of whether substantial evidence on the record as a whole supports the decision. 42 U.S.C. 405(g); *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005) (quoting *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). In determining whether evidence is substantial, the court must consider both evidence that supports and evidence that detracts from the Commissioner's decision. *Moore ex rel Moore v. Barnhart*, 413 F.3d 718, 721 (8th Cir. 2005). If it is possible to draw two inconsistent

positions from the evidence, and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision. *Vandenboom v. Barnhart*, 421 F.3d 745, 749 (8th Cir. 2005).

**B.      Discussion**

Plaintiff challenges the ALJ's RFC finding and conclusion that there are a significant number of jobs in the national economy that he can perform. Plaintiff's arguments fall under three categories: 1) the ALJ failed to properly weigh the medical opinions; 2) the ALJ's credibility analysis was flawed; 3) the ALJ's hypothetical question to the VE was flawed; therefore, the ALJ's conclusion that there was other work in the economy Plaintiff could perform was not supported by substantial evidence in the record. Plaintiff asserts his case should be reversed and remanded for award of benefits, but alternatively should be remanded for further proceedings.

**1.      The Medical Opinions**

The ALJ reviewed Plaintiff's hand and feet deformities and surgeries in detail, noting Plaintiff's improvement after foot surgeries. (Tr. 687, 692.) She found Dr. Steiner's opinion of Plaintiff's hand restrictions consistent with Dr. Carpenter's October 2001 examination. (Tr. 692.) She summarized Plaintiff's and his wife's subjective testimony. (Tr. 690.) The ALJ gave great weight to Dr. Steiner's testimony, based on the evidence in the record as a whole. (Tr. 691.) She noted Plaintiff's psoriatic arthritis was controlled by medications; and when one medication became ineffective, it was changed to another medication that was more effective. (*Id.*) The ALJ specifically went over the medication changes from 2001 through December 2006. (Tr. 691-92.) The ALJ said she accommodated Dr. Armendariz's opinion in her RFC finding. (Tr. 692.) She found Plaintiff's subjective complaints were inconsistent with Dr. O'Brien's examination, because Plaintiff did not give

26

full effort on a strength test and did not appear to be in pain during the examination, as alleged. (Tr. 692-93.)

Regarding Plaintiff's depression, the ALJ noted Plaintiff was euthymic, and had a normal mental status examination conducted by Dr. Huddleston soon after Social Worker Pray gave her opinion that pain and depression disabled Plaintiff. (Tr. 694.) The ALJ also noted Plaintiff sought little counseling for depression, and his therapist's opinions were based on little time spent with him. (Tr. 693-94.) Dr. Pace noted that Plaintiff's depression improved. (Tr. 694.) The ALJ then gave specific reasons for not giving more credit to Plaintiff's pain allegations: his hand discomfort was mild and not particularly limiting; psoriatic arthritis was controlled by various medications; there was no active synovitis in the joints; Plaintiff admitted being on his feet "a lot" when he reported foot pain to Dr. Leach; MRIs of Plaintiff's cervical and lumbar spine in 2004 and 2005 showed only mild disc degeneration. (Tr. 695.)

An ALJ should give a treating physician's opinion controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)). An ALJ can discount a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). If the ALJ does not give the treating physician's opinion controlling weight, she should consider the following factors in weighing the medical opinions: 1) type of relationship with physician; 2) supportability of the opinion; 3) consistency of the opinion with the record as a whole; 4) specialization; and 5) any factors brought to the ALJ's attention. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (citing 20 C.F.R.

§ 404.1527(d)).  "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole."  *Id.* at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

Dr. Pace had the longest treating relationship with Plaintiff, and Dr. Steiner had no relationship with Plaintiff.  Dr. Pace's opinion is supported by Plaintiff's subjective complaints, and by Dr. Carpenter's July 2002 opinion, where Dr. Carpenter explicitly incorporated Plaintiff's own opinion of his functional capacity into his residual functional capacity finding.  Dr. Pace's opinion is also supported by a Physical Residual Functional Capacity Questionnaire Dr. Stone completed for Plaintiff on July 9, 2002, and by disability forms completed by two social workers, Pray and Young.  The ALJ recognized this but did not credit Dr. Pace's opinion because it was inconsistent with other evidence, and based primarily on Plaintiff's subjective complaints, which were not credible.

The following evidence is inconsistent with Dr. Pace's RFC opinion and/or more consistent with Dr. Steiner's less restrictive opinion:  1) Dr. Carpenter's treatment note of April 2001, where he stated Plaintiff would likely be able to perform light or sedentary work after foot surgery;  2) Dr. Stone's notation that Plaintiff's feet were "essentially asymptomatic" several months after surgery in April 2001; 3) Dr. Stone's July 2002 statement, in a Family Medical Leave Act certification, that Plaintiff was restricted to work without prolonged walking, standing or lifting, and he recommended vocational rehabilitation; 4) objective clinical, x-ray and MRI findings, the most severe of which were deformities of the feet after reconstructive surgery; sclerosis of left sacroiliac; foraminal narrowing at C3-4 of the cervical spine; periodic psoriatic lesions; prior surgeries on his index and fifth finger of the left hand; 5) Dr. Carpenter's October 2001 opinion for sedentary or light work with "proper degree of autonomy regarding movement"; 6) Dr. Armendariz's opinion for sedentary work; 7)

conservative treatment options suggested by Dr. Leach; 8) Dr. Huddleston's psychological opinion; 9) the majority of Dr. O'Brien's opinion, excluding the need to change position every fifteen minutes; 10) most of the restrictions recommended by state agency medical consultants in the years 2001 through 2005; 11) Dr. Pace's treatment notes that Plaintiff's depression improved and then resolved; 12) Dr. Pace's treatment notes that Plaintiff's medications for psoriatic arthritis were usually effective, and there was almost never any synovitis, swelling or effusion in Plaintiff's joints; 13) multiple pain ratings under 7 out of 10; 14) lack of any clinical findings, x-ray or MRI findings to support allegation of severe knee pain. Thus, the evidence in the record as a whole, including other medical opinions, greatly favors Dr. Steiner's RFC opinion.

Plaintiff argues that the ALJ failed to consider Drs. Carpenter and Stone's more restrictive RFC opinions. Drs. Carpenter and Stone completed disability questionnaires on Plaintiff's behalf, but their responses on those questionnaires were inconsistent with earlier statements in their treatment notes that Plaintiff could be expected to perform sedentary work. It was reasonable for the ALJ to give greater weight to the contemporaneous treatment notes over the inconsistent disability questionnaires completed for the purpose of obtaining disability benefits. *See Prosch*, 201 F.3d at 1013 (ALJ properly discounted treating physician's second opinion that was based on the same information as the first, inconsistent opinion); *Hogan*, 239 F.3d at 961(ALJ did not err in discounting inconsistent and unsupported portions of treating physician's medical source statement, where treatment notes indicated condition was mild and controlled by medication.)

Plaintiff contends the ALJ erred by adopting Dr. Steiner's work restrictions regarding his hands because the ALJ cited only to Dr. Carpenter's 2001 examination as consistent with the RFC opinion. There is, however, substantial evidence in the record, supporting Dr. Steiner's opinion of

Plaintiff's hand limitations. Although Plaintiff had past surgeries on his hands and could not fully bend all of his fingers, he rarely had any inflammation in the joints of his hands over the time period at issue, and had few flares of hand pain. Plaintiff underwent a consultative physical examination in February 2004, and Dr. O'Brien found Plaintiff had an unlimited ability to reach, handle, and finger objects, although lifting would be restricted to twenty pounds occasionally, and ten pounds frequently. There are no clinical findings to support Dr. Pace's extreme hand limitations.

Plaintiff also asserts the ALJ erred by discounting Social Workers Pray and Young's opinions without obtaining their treatment notes. The ALJ should consider evidence in the record from a therapist, but need not obtain additional records from the therapist, if there is substantial psychological evidence in the record. *Strongson v. Barnhart*, 361 F.3d 1066, 1071-72 (8th Cir. 2004). Dr. Pace treated Plaintiff's depression by prescribing medication over a number of years, a much longer period than Plaintiff treated with a therapist. Dr. Pace's notes indicate that Plaintiff's depression was well-controlled with medication. Plaintiff did not often appear depressed or complain of uncontrolled depressive symptoms. Additionally, Plaintiff was evaluated by two psychologists during the relevant time period, Drs. Huddleston and Narvaiz, whose complete evaluations are in the record. Therefore, ALJ was not required to further develop the record with the therapists' treatment notes.

Drs. Huddleston's and Narvaiz's evaluations both indicated that Plaintiff's mental status examination was normal, contrary to the limitations proposed by Pray and Young. Based on Dr. Huddleston's opinion that Plaintiff would have some reduced stress tolerance, the ALJ properly restricted Plaintiff to unskilled to semi-skilled work with low to moderate standards for pace and persistence. *See Roe v. Chater*, 92 F.3d 672, 676 (8th Cir. 1996) (hypothetical question need not include specific diagnostic or specific terms where other terms adequately define the concrete

consequences that flow from the impairments). The ALJ also properly restricted Plaintiff to work with brief and superficial contact with others, based on Dr. Narvaiz's opinion that pain might cause Plaintiff to be irritable. For all of these reasons, substantial evidence in the record supports the ALJ's analysis of the medical opinions.

### 2.      Credibility Analysis

Plaintiff asserts the ALJ's credibility analysis is boilerplate, conclusory and does not reference evidence in the record. Plaintiff contends the ALJ cites to only four records, none of which reference Plaintiff's severe pain, erosive arthritis, and feet and hand deformities. Plaintiff also argues the ALJ failed to consider how Plaintiff's wife's testimony impacted his credibility. Finally, Plaintiff asserts the ALJ failed to credit Plaintiff's pain complaints, although he was prescribed and using powerful narcotic pain medication.

"[A]n ALJ may not discount a claimant's allegation of disabling pain solely because the objective medical evidence does not fully support" the allegations. *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) (quoting *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003) (citation omitted)). But an ALJ may discount subjective complaints "if there are inconsistencies in the evidence as a whole." *Id.* (quoting *Strongson*, 361 F.3d 1072 (quoting *Goodale v. Halter*, 257 F.3d 771, 774 (8th Cir. 2001)). The ALJ need not methodically discuss each credibility factor, as long as she acknowledges and considers those factors. *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000). The court will affirm the ALJ's credibility analysis when the ALJ, for good cause, expressly discredits a claimant's complaints of disabling pain. *Goff,* 421 F.3d at 792.

The ALJ recognized that Plaintiff's wife testified in a manner consistent with Plaintiff's subjective allegations. The ALJ was not required to credit this testimony. "[C]orroborating testimony

of an individual living with a claimant may be discounted by the ALJ, as that person has a financial interest in the outcome of the case." *Bannister v. Astrue*, 730 F.Supp. 2d 946, 956 (S.D. Iowa 2010) (quoting *Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006)).

Use of strong narcotic pain medication typically favors a claimant's subjective complaints of pain, but does not mandate a finding that Plaintiff's pain complaints are fully credible. *See e.g. Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005) (discounting claimant's credibility where objective findings were minimal, medication relieved his pain, and doctor was concerned claimant was addicted to medications). Although Dr. Pace was treating Plaintiff with narcotic pain medication, Dr. Leach recommended conservative treatment with oral anti-inflammatory medication, massage with topical theragesic, cortisone injections, wide toe boxed shoes, ice, physical therapy, "relative rest", and custom orthotics. The Court notes that on March 19, 2010, although it was after Plaintiff was found disabled, Dr. Jeffrey Dick reviewed MRIs of Plaintiff's cervical and lumbar spine, noting the findings to be relatively mild. (Tr. 1454.) Dr. Dick believed Plaintiff was narcotic dependent, making him a poor candidate for fusion; and he stated, "it is my expectation that if he gets off of the narcotics, his symptoms would improve with time." (*Id.*)

Here, the objective evidence does not support the severity of Plaintiff's pain complaints, but the ALJ also discounted Plaintiff's credibility based on evidence that Plaintiff's psoriatic arthritis and depression were well-controlled with medication, although there were times when one arthritis medication ceased working and another had to be substituted. Dr. Pace noted the effectiveness of these medications when Plaintiff followed up with her, and changed medications when necessary. Evidence of effectiveness of treatment with methotrexate, Humira, Enbrel, and Remicade is found throughout Dr. Pace's treatment notes, which indicate few recurrences of psoriasis, and few, if any,

episodes of joint swelling, synovitis or effusion. Plaintiff also reported improvement in his feet after surgeries in 2001 and 2006. Additionally, Plaintiff rarely complained of side effects, and when he did, his medications were adjusted; for example, his Duragesic was decreased when he complained of grogginess. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Bannister*, 730 F.Supp. 2d at 955 (quoting *Shultz v. Astrue,* 479 F.3d 979, 983 (8th Cir. 2007) (quotation omitted)).

There are other inconsistencies in the record with Plaintiff's allegations of extreme limitations. *See Perkins v. Astrue*, 648 F.3d 892, 899 (8th Cir. 2011) (noting additional evidence in the record supporting the ALJ's decision, beyond the reasons cited by the ALJ.) On several occasions, Plaintiff drove long distance to visit relatives with only a small increase in pain, rating his pain between four and six out of ten. In one instance, Plaintiff complained of headaches caused by spending a lot of time staring at his computer screen, implying that he was spending more time sitting than he alleged. On another occasion, Plaintiff complained of increased feet pain after spending a lot of time on his feet, implying that he was standing or walking more than he alleged. Plaintiff certainly suffers some pain, but "[w]hile pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability." *Perkins*, 648 F.3d at 900 (quoting *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996)). For these reasons, the ALJ provided adequate reasons for discounting claimant's subjective complaints, and substantial evidence in the record supports the ALJ's RFC finding. Because the ALJ's RFC finding is supported by substantial evidence in the record and was included in the hypothetical question posed to the vocational expert, the ALJ properly relied on the vocational expert's response to the hypothetical question. *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir.

2005).  Therefore, the ALJ's decision denying disability insurance benefits between April 25, 2001 and December 31, 2006, should be affirmed.

## IV.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED THAT:**

1.      Plaintiff's Motion for Summary Judgment (#16) **be DENIED.**

2.      Defendant's Motion for Summary Judgment (#23) **be GRANTED;**

3.      The case be **DISMISSED WITH PREJUDICE AND JUDGMENT BE ENTERED.**


DATED: September 28, 2012

*s/ Franklin L. Noel*
FRANKLIN L. NOEL
Unites States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before October 15, 2012, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words.  A district court judge shall make a de novo review of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.